DECISION
{¶ 1} Relator, Melvyn I. Dinner, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying his application for wage loss compensation pursuant to R.C. 4123.56(B) and to enter a new order granting said compensation.
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that respondent-commission had abused its discretion by improperly altering the burden of proof and that this court should issue a limited writ.
 {¶ 3} No objections were filed to the decision of the magistrate.
 {¶ 4} Finding no error of law or other defect on the face of the magistrate's decision, we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained in it. In accordance with the decision of the magistrate, we issue a writ of mandamus ordering respondent-commission to vacate its order denying relator's wage loss claim, and in a manner consistent with the magistrate's decision, to enter a new order that appropriately adjudicates the wage loss claim.
Writ of mandamus granted.
Petree and Klatt, JJ., concur.
 (APPENDIX A) MAGISTRATE'S DECISION IN MANDAMUS {¶ 5} In this original action, relator, Melvyn I. Dinner, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him R.C. 4123.56(B) wage loss compensation beginning July 19, 2000, and to enter an order granting said compensation.
 Findings of Fact {¶ 6} 1. Relator, Melvyn I. Dinner, M.D., is a board certified plastic surgeon licensed to practice in the state of Ohio. Relator has two industrial claims that arose during his employment as a plastic surgeon. The first claim involves injuries sustained in a motor vehicle accident occurring November 24, 1987. The second claim involves injuries sustained in a motor vehicle accident occurring July 18, 2000. The wage loss claim at issue here was filed in the second industrial claim.
 {¶ 7} 2. Relator's November 24, 1987 industrial claim (No. 87-52516) has been allowed for: "sprain of neck, herniated nucleus pulposus C5-6 and C6-7."
 {¶ 8} 3. In November 1994, relator underwent neck surgery performed by orthopedic surgeon Henry H. Bohlman, M.D. Dr. Bohlman is also a professor of orthopedic surgery at Case Western Reserve University School of Medicine. The surgery was an "anterior cervical discectomey and fusion at C5-6 and C6-7." After the surgery, relator returned to full-time employment as a cosmetic surgeon.
 {¶ 9} 4. In June 1999, relator incorporated his medical practice whereby he became an employee of the Institute For Cosmetic Surgery, Inc. The principal office of the corporation was located in Beachwood, Ohio, where relator practiced cosmetic surgery.
 {¶ 10} 5. According to a report from his treating physician, neurologist Jack Anstandig, M.D., in December 1999, relator began receiving more frequent acupuncture treatments for his "chronic cervical pain condition." (Dr. Anstandig's August 5, 2002 report.)
 {¶ 11} 6. According to a report from Dr. Bohlman, because relator "was having so much difficulty flex[ing] his head down in May, 2000 he stopped operating to see if this would subside." (Dr. Bohlman's January 26, 2001 report.)
 {¶ 12} 7. On June 16, 2000, relator underwent an MRI of the cervical spine following referral by Dr. Anstandig. The MRI report is contained in the record.
 {¶ 13} 8. As previously noted, on July 18, 2000, relator was involved in a motor vehicle accident giving rise to his second industrial claim. The July 18, 2000 industrial claim is allowed for: "sprain of neck; aggravation of pre-existing cervical fusion at C5-6 and C6-7, and aggravation of pre-existing herniated disc at C3-4," and is assigned claim number 00-466966. The employer of record for this claim is respondent Institute for Cosmetic Surgery, Inc.
 {¶ 14} 9. On January 26, 2001, Dr. Bohlman wrote:
I first operated on Dr. Dinner in November, 1994 for a cervical spondylosis, herniated disc with radiculopathy and carried out an anterior cervical discectomy and fusion at C5-6 and C6-7. Postoperatively he did extremely well. His pain was relieved and he went back to full activities. I subsequently saw Dr. Dinner again on October 2, 2000. At that time he presented with severe mid-cervical, left shoulder, interscapular and left pectoral pain with occasional arm pain. This all beg[a]n in December, 1999 and was sort of smoldering along. Because he was having so much difficulty flex[ing] his head down in May, 2000 he stopped operating to see if this would subside. He wound up having to take medicate analgesics for the pain. Finally on July 18, 2000 he was driving on Cedar Road headed for Route 271 and a lady came out of a side street and he hit her head on. He immediately felt numbness of his left arm and neck pain. He went to Hillcrest Emergency Room where they x-rayed him and saw some subluxation of C4-5 and decided that it may be old. He had a repeat MRI. He was seen at the Cleveland Clinic subsequent to that in consultation prior to me seeing him in October, 2000.
When I saw Dr. Dinner and examined him in the office he had almost no extension of the cervical spine whatsoever which caused severe neck pain. His lateral rotation was very limited also and somewhat limited on forward flexion. He was quite tender on palpation over C4-5 posteriorly.
Neurologically he had slight decrease sensation to pin prick over the dorsum on the left thumb and index finger, but otherwise he was normal.
X-rays obtained at that time showed a solid fusion at C5-6 and C6-7, but he had 3-4 millimeters of subluxation at C4-5 and on his MRI revealed central disc protrusions at C3-4 and C4-5, which were effacing and compressing the spinal cord. At that level he had almost no room for his spinal cord at all. It was my opinion at that time any hyperextension produced further compression of his spinal cord and nerve roots.
I believe that Dr. Dinner needs an anterior cervical corpectomy of C4 and a discectomy above and below with an iliac strut fusion to relieve his problem.
Surely he had pre-existing disc protrusion, although we are not sure about the subluxation, but I think the situation was acutely aggravated and exacerbated by the vehicular accident of July 18, 2000. I really do think he is going to require surgical decompression and fusion to get him back to a more functional human being and in his profession. I say this with a great deal of certainty having spent the last 28 years dealing with degenerative and traumatic spine problems.
 {¶ 15} 10. Approximately one year after the automobile accident of July 18, 2000, relator entered into an agreement with Mark A. Foglietti, D.O., a board certified plastic surgeon who had "joined" relator's medical practice in April 2000. Because he was no longer able to perform surgery, relator entered into the agreement with Dr. Foglietti whereby relator became employed by Dr. Foglietti's corporation, Mark A. Foglietti, D.O., Inc. Under the agreement, relator is compensated by the Foglietti corporation as a consultant for a period of three years, i.e., from May 1, 2000 through April 30, 2003. Under the agreement, Dr. Foglietti's corporation purchased the trade name, Institute For Cosmetic Surgery, Inc., and certain goods and chattels.
 {¶ 16} 11. Relator's compensation as a consultant under the agreement with Dr. Foglietti is substantially less than the income relator generated as a practicing plastic surgeon prior to May 2000.
 {¶ 17} 12. On February 28, 2002, relator moved for R.C.4123.56(B) wage loss compensation. His motion claimed entitlement to "working wage loss compensation" beginning July 18, 2000, the date of his second industrial injury. In support of his wage loss application, relator submitted a report from Laurence Bilfield, M.D. This report was an Ohio Bureau of Workers' Compensation ("bureau") form completed by Dr. Bilfield on March 8, 2002. On the form, Dr. Bilfield indicated that, based upon a November 29, 2001 examination, relator is "unable to do any work, surgery," and this condition is "permanent."
 {¶ 18} 13. Following a June 6, 2002 hearing, a district hearing officer ("DHO") issued an order denying relator's wage loss claim. Relator administratively appealed the DHO's order of June 6, 2002.
 {¶ 19} 14. On August 5, 2002, Dr. Anstandig wrote:
He was involved in a motor vehicle accident on 7/18/00. Following the accident, there was a worsening of his cervical condition which resulted in pain, spasm, and further sensory symptoms involving his left arm. As noted above, his cervical condition was pre-existing prior the accident. However, following the accident, there was a change in his overall condition. Imaging studies did not show any significant difference. However, the patient experienced further functional limitations which precluded his attempts to return to the operating room as a surgeon.
As his treating physician before and after the accident, the above points are outlined to help clarify his condition and its relationship to the accident of 7/00.
 {¶ 20} 15. Following an August 20, 2002 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order of June 6, 2002. The SHO's order states:
Claimant's request for Working Wage Loss Compensation from 07/19/2000 to date is hereby denied, as there is insufficient medical evidence to substantiate that any wage loss is causally related to the injury herein.
It is claimant's contention that as a direct result of the injuries sustained in this 07/18/2000 industrial motor vehicle accident claimant has been unable to perform surgery and, hence, has suffered a substantial wage loss. (A review of the police report and the testimony of the claimant regarding this 07/18/2000 motor vehicle accident is a good starting point. The evidence is that the motor vehicle accident was not a "severe" collision. The damage was minimal. No EMS unit was dispatched. No tow trucks were called as no cars were disabled. Each vehicle was driven away. The conclusion being that the nature of the initial injury was not severe enough to cause disabling damage to the autos nor were any persons involved in the motor vehicle accident deemed seriously injured enough to have an EMS unit dispatched.)
The medical records/reports of Drs. Bohlman and Foglietti as well as the financial records entered into evidence establish that claimant ceased performing surgery in approximately May of 2000, six to nine weeks prior to this injury. Therefore, it has not been established that the injury herein is the proximate cause of claimant's wage loss and, accordingly, such wage loss compensation request from 07/19/2000 to date is denied.
Claimant originally suffered a motor vehicle accident on 11/24/1987, claim number: 87-52516, which formally has been allowed for SPRAIN OF NECK, HERNIATED NUCLEUS PULPOSUS C5-6 AND C6-7. In November of 1994 Dr. Henry Bohlman operated on claimant for "cervical spondylosis, herniated disc with radiculopathy and carried out an anterior cervical discectomy and fusion at C5-6 and C6-7" based on such doctor's report dated 01/26/2001. Pursuant to such Dr. Bohlman report and, as confirmed by claimant at hearing, claimant did extremely well after the surgery in 1994 until approximately December of 1999.
In December of 1999 claimant began to experience neck pain radiating down the left arm and had difficulty flexing his head down. This pain continued to "sort of smolder" along until such point that claimant decided to take a two week hiatus from operating on patients to see if the pain would subside. The exact nature and extent of claimant's neck problems commencing in December of 1999 cannot be ascertained as none of the medical records associated with this period of time until 07/18/2000 have been entered into evidence.
It clearly has been established that the neck pain was such that it required claimant to stop operating on patients in May of 2000. What remains at issue, however, is whether claimant returned to his surgical duties after this May of 2000 hiatus. Claimant testified that he stopped operating on patients in May of 2000 for two weeks then was off work in Arizona for two weeks thereafter pursuant to his typical work schedule. Claimant further testified at hearing that he believes he did return to surgery after such hiatus. He testified at the District Hearing Officer hearing that he would provide his surgical calendar subsequent to the hearing. No such surgical calendar has been entered into evidence.
There remain two very important issues that must be resolved in order to properly adjudicate the wage loss request. The first issue is how claimant's neck responded to such two-week hiatus. This is a medical issue. Since none of the medical records from the various doctors that treated claimant from December of 1999 until 07/18/2000 have been entered into evidence, it is impossible to establish claimant's pre-injury neck condition. Claimant has failed to sustain his burden of proof, from a medical perspective, that his inability to perform surgery and thus his wage loss is causally related to the injury herein.
Claimant submitted the 08/05/2002 report of Dr. Anstandig to this hearing. The Staff Hearing Officer does not find this report persuasive nor does it meet claimant's burden of proof. It fails to persuasively establish claimant's pre date of injury status or how the time off claimant allegedly was not performing surgery prior to 07/18/2000 affected his ability to ultimately be able to return to surgery.
The second issue is whether claimant ever returned to operating on patients after the May of 2000 hiatus. Claimant's testimony at the District Hearing Officer hearing was equivocal. He testified that he believes that he returned to surgery after his May 2000 hiatus and before this injury, but he was unsure of the same. Claimant's testimony, therefore, cannot be relied upon. Dr. Bohlman's 01/26/2001 report does not squarely address whether claimant returned to surgery after the May of 2000 hiatus, but implies that he did not.
Dr. Bilfield's report and records provide absolutely no assistance in answering this issue of when claimant ceased operating on patients. Actually, such reports are factually incorrect and, hence, cannot be relied upon. Dr. Bilfield does not mention the May 2000 hiatus just two months prior to the injury herein or the 06/15/2000 cervical MRI just one month prior to this injury. In fact, in his 01/15/2001 report, Dr. Bilfield erroneously states that the prior cervical problem was "quiescent" and was not problematic until after this July 18, 2000 motor vehicle accident. This is absolutely contrary to claimant's testimony at the District Hearing Officer hearing that he was having a lot of neck trouble prior to this 07/18/2000 injury. Dr. Bilfield's comment of claimant's neck being quiescent prior to the injury herein is further contrary to the fact that claimant had to take a hiatus just two months before this injury and then had a cervical MRI one month before this injury.
Dr. Foglietti in his 05/06/2000 letter states "Dr. Dinner never returned to operating on patients in any capacity whatsoever after May 2000." The weight of the evidence suggests that claimant did not return to surgery after his hiatus in May of 2000. As Dr. Foglietti was the managing partner in the practice and the one who had to perform more of the surgeries as the claimant concentrated on the consultation aspect of the practice, his letter is found persuasive.
It is uncontroverted by the doctors that claimant can no longer perform surgery because of his neck problems. It is further claimant's testimony and contention that this inability to perform surgery is the cause of his substantial wage loss. What claimant, however, has not established is that such inability to perform surgery is a direct and proximate result of the injury herein. The weight of the evidence establishes that claimant had not been able to perform surgery for 2 or 2-1/2 months prior to this injury. Therefore, this Staff Hearing Officer finds that this inability to actually perform surgery and resulting wage loss is not causally related to the injury herein.
The Staff Hearing Officer also considered that the fact that the claimant was approaching the age (58) when many workers naturally begin to consider either "slowing down," retirement, or working less.
This is consistent with the evidence above, especially the claimant's pre-injury problems which resulted in wage loss. As this wage loss is not the result of the 07/18/2000 industrial injury, the requested wage loss compensation is denied.
(Emphasis sic.)
 {¶ 21} On September 19, 2002, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of August 20, 2002.
 {¶ 22} On April 3, 2003, relator, Melvyn I. Dinner, filed this mandamus action.
 Conclusions of Law {¶ 23} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 24} Some six to nine weeks prior to his July 18, 2000 automobile accident, relator decided to discontinue performing surgery to see whether a respite might improve the condition that was impairing his ability to perform surgery. The status of his preexisting condition during the weeks prior to the July 18, 2000 accident was the subject of inquiry at the commission hearings. However, there is no medical evidence showing that, immediately prior to the July 18, 2000 automobile accident, relator waspermanently unable to return to an active surgical practice.
 {¶ 25} It is understandable that the commission would be concerned that relator might have been permanently unable to return to surgery prior to the July 18, 2000 automobile accident. If it could be proven that, medically, relator was permanently
unable to return to an active surgical practice prior to the July 18, 2000 automobile accident, then the July 18, 2000 injury would not be the proximate cause of relator's post-injury inability to perform surgery. On that basis, the wage loss claim could be denied.
 {¶ 26} While its concern for causation is understandable, the commission nevertheless abused its discretion by requiring relator to establish that he would have eventually returned to an active surgical practice absent the July 18, 2000 injury. The commission improperly placed the burden of proof on relator to eliminate the preexisting condition as a possible cause of his disability. Relator's burden of proof on causation does not extend that far.
 {¶ 27} In State ex rel. Quarto Mining Co. v. Foreman
(1997), 79 Ohio St.3d 78, 83-84, the court addresses the burden of proof of a PTD applicant. The court states:
* * * The claimant's burden is to persuade the commission that there is a proximate causal relationship between his work-connected injuries and disability, and to produce medical evidence to this effect. Murphy v. Carrollton Mfg. Co. (1991),61 Ohio St.3d 585 * * *; State ex rel. Basham v. ConsolidationCoal Co. (1989), 43 Ohio St.3d 151 * * *; Fox v. Indus. Comm.
(1955), 162 Ohio St. 569 * * *; Aiken v. Indus. Comm. (1944),143 Ohio St. 113 * * *. The claimant's burden in this regard does not extend so far as to require him to raise, and then eliminate, other possible causes of his disability. This is not a case in which the cause remains unexplained, as in slip-and-fall cases. Here, the claimant has produced direct medical evidence linking his disability with the injuries allowed in the claim. This evidence is sufficient to establish a prima facie causal connection. The burden should then properly fall upon the employer to raise and produce evidence on its claim that other circumstances independent of the claimant's allowed conditions caused him to abandon the job market.
 {¶ 28} In State ex rel. Ignatious v. Indus. Comm.99 Ohio St.3d 285, 2003-Ohio-3627, the commission denied TTD compensation even though the claimant had supplied evidence of a direct causal relationship between his allowed neck conditions and his disability. The commission appeared to have denied TTD compensation on grounds that the claimant had failed to further show that his nonallowed carpal tunnel syndrome was not causing his inability to work. The court stated that the claimant is not "required to disprove a negative." Id. at ¶ 33.
 {¶ 29} Indicating that the commission had improperly altered the burden of proof, the Ignatious court explained:
* * * In response to the bureau's request for clarification, Dr. Ruch supplied a January 9, 2001 C-84 and a May 18, 2001 letter. The former listed "neck pain" as the sole cause of disability and the latter expressly to the allowed conditions of "sprain of neck and herniated discs C4-5 and C5-6." That the commission order continued even after these clarifications to rely on the presence of carpal tunnel syndrome to disqualify this evidence implies but one thing: that the evidence was deemed insufficient because it did not affirmatively state that carpal tunnel syndrome was not influencing claimant's inability to work. In tacitly requiring this, the commission overstepped its bounds.
Id.
 {¶ 30} The Ignatious case is instructive here. The March 8, 2002 report of Dr. Bilfield, the January 26, 2001 report of Dr. Bohlman, and the August 5, 2002 report of Dr. Anstandig present medical evidence of a proximate causal relationship between the July 18, 2000 industrial injury (automobile accident) and relator's post-injury inability to perform cosmetic surgery. Yet, the commission seems to have rejected those reports as being insufficient to meet the medical causation requirement of the wage loss claim because the reports do not answer the question of whether relator's preexisting condition would have eventually permitted him to return to his cosmetic surgery practice absent the July 18, 2000 injury. Significantly, there is no medical evidence in the record upon which the commission could conclude that relator's preexisting medical condition permanently prevented him from returning to his previous surgical practice.
 {¶ 31} The commission abused its discretion here, as it did in the Ignatious case. The commission improperly altered the burden of proof on the issue of medical causation.
 {¶ 32} Parenthetically, the magistrate notes that relator asserts here that his medical evidence showing a proximate causal relationship between his July 18, 2000 automobile accident and his inability to perform surgery cannot be discounted by his decision to take a "respite" from surgery beginning May 2000, because he "fully intended to return to surgery." (Relator's brief at 8.)
 {¶ 33} Relator's intention with respect to a return to surgery is relevant to the causation issue before the commission. If relator did not intend to return to surgery, causation is negated even if the preexisting condition would have medically permitted his return to surgery. However, the commission's order does not indicate that the commission found that relator did not intend to return to surgery prior to his July 18, 2000 automobile accident.
 {¶ 34} The magistrate also parenthetically notes that the commission attempted to discredit relator's medical evidence by speculating from the police report that the motor vehicle accident was not serious enough to impair relator's ability to perform surgery. This was an abuse of discretion. Neither the commission nor its hearing officers are medical experts. Stateex rel. Yellow Freight Sys., Inc. v. Indus. Comm. (1998),81 Ohio St.3d 56. Accordingly, the commission cannot render a finding that the automobile accident could not produce the kind of injury claimed by relator in the absence of expert evidence on the matter. Id.
 {¶ 35} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying relator's wage loss claim, and in a manner consistent with this magistrate's decision enter a new order that adjudicates the wage loss claim.